**Affirmed and Opinion filed April 23, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00809-CV

## GUGGENHEIM CORPORATE FUNDING, LLC, ORPHEUS HOLDINGS LLC, STELLAR FUNDING LTD., AND ORPHEUS FUNDING LLC, Appellants

V.

## VALERUS COMPRESSION SERVICES, L.P., Appellee

**On Appeal from the 157th District Court
Harris County, Texas
Trial Court Cause No. 2011-36283**

## O P I N I O N

This appeal arises from the trial court's judgment, following a bench trial, rescinding a 2009 amended warrant agreement involving Valerus Compression Services, L.P., Guggenheim Corporate Funding, LLC, Orpheus Holdings, LLC, Stellar Funding Ltd., and Orpheus Funding LLC (collectively, Guggenheim). Valerus filed the underlying suit seeking rescission of the amended warrant due to its factual mistake about the parties' mutual intent in executing the original warrant

agreement.  Guggenheim appeals and asserts that (1) the trial court erred by holding the parties' original and interim warrants were ambiguous, (2) the trial court erred by finding in favor of Valerus on its mistake theories, (3) there is legally and factually insufficient evidence to support Valerus's mistake claims, (4) the trial court erred in granting judgment for Valerus because the record conclusively establishes that Valerus bore the risk of mistake, and (5) the trial court erred in denying Guggenheim's counterclaim for breach of contract and attorney's fees.  We determine that (1) the warrants at issue were ambiguous, (2) Valerus's unilateral mistake claim is supported by legally and factually sufficient evidence, (3) Valerus did not bear the risk of mistake, and (4) the trial court did not err in denying Guggenheim's counterclaim for breach of contract and attorney's fees.  Accordingly, we affirm the trial court's judgment.

## I.    BACKGROUND

*The Original Warrant*

Valerus, a gas compression limited partnership that is a capital-intensive business, needed a cash influx in 2006.  In August, Valerus entered into a $165 million credit agreement negotiated with and funded by Guggenheim Corporate Funding (GCF).  In return, Valerus proposed to issue GCF a warrant to purchase shares in Valerus at a fixed price (the Original Warrant).[1]  During the negotiations, Valerus was represented by outside counsel Stephenson Snokhous & Fournier

---

[1] The trial court's findings of fact and conclusions of law describe a warrant as follows:

A warrant is a derivative security that gives the holder the right to purchase securities from the issuer at a specific price within a certain time frame.  Warrants are often included in a new debt issue as a "sweetener" to entice investors.  The main difference between warrants and call options is that warrants are issued and guaranteed by the company, whereas options are exchange instruments not issued by the company.  In addition, the lifetime of a warrant is often measured in years, while the lifetime of a typical option is measured in months.

(SS&F) and investment banking firm Sanders Morris Harris (SMH).[2] Guggenheim was represented by Jeffrey Nichols, who moved to Greenberg Traurig, LLP, during the pendency of the transaction.

The parties, including outside counsel and investment bankers, exchanged numerous emails and redlined-versions of the Original Warrant during a very short period of time before the transaction closed. One of the major issues between the parties was that GCF sought protection from dilutive events by requesting a blanket 3.5% interest in Valerus calculated at the time of exercise of the Original Warrant. Valerus objected, asserting that the original deal term sheet contemplated that GCF would receive a 3.5% interest in Valerus calculated at the time of the closing of the deal.

The parties ultimately agreed that GCF would receive a five-year warrant term that specified the number of shares to which GCF would be entitled and provided GCF limited dilution protection, i.e., the right to receive additional shares beyond the initially agreed amount for certain narrowly defined events. Under the final terms of the Original Warrant, GCF had the right to purchase a minimum of 954,292 Valerus shares at $0.01 per unit at any time until August 10, 2011. In 2008, Valerus split the Original Warrant into three warrants (the Interim Warrants) so that the warrant could be divided among three Guggenheim entities: Orpheus Holdings, Stellar Funding, and Orpheus Funding. Again, GCF remained the administrative agent for Orpheus Holdings, Stellar Funding, and Orpheus Funding. The provisions of the Original Warrant remained substantively the same in the

---

[2] At the time of the negotiations, Jim Stephenson, a principal in SS&F, was also serving as Valerus's general counsel.

Interim Warrants.[3] Valerus repaid Guggenheim under the terms of the credit agreement in 2007 by entering into a larger credit agreement with another lender.

*Valerus's Negotiations with Investors Raises Questions About the Warrants.*

In late 2008 and early 2009, under pressure from its new lender, Valerus again found itself short of capital and began seeking equity infusions. Because of the difficulty in obtaining equity financing, Valerus also considered the option of bankruptcy during this time period. Valerus began negotiating with a third party—Metalmark Capital Holdings LLC—for a sale of Valerus's equity in 2009.[4]

Valerus's general counsel, Dawn Born Cunningham, conducted the negotiations on behalf of Valerus. SMH was again involved as Valerus's investment banker. Valerus was also represented by outside counsel, King and Spalding, during the discussions with the Metalmark investors. In connection with those discussions, the dilution protection afforded Guggenheim in the Interim Warrants became an issue of concern to Metalmark. Specifically, Metalmark's counsel concluded that if Guggenheim had dilution protection for equity issuances to third-party investors such as Metalmark, then the proposed Metalmark transaction would entitle Guggenheim to more shares upon exercise of the Interim Warrants; Metalmark wanted to structure the transaction so that the Valerus stakeholders, not Metalmark, bore the cost of those additional shares to Guggenheim.

---

[3] A drafting error in the Interim Warrants was also corrected in 2008, but has no impact on this dispute.

[4] Earlier negotiations with TPG Capital, Inc., with whom Valerus ultimately entered into the equity transaction later in 2009 described *infra*, broke down.

4

*Valerus Seeks to Confirm Intent of Original Warrant*

Because she was uncertain about the dilution protection provided in the Interim Warrants, Cunningham sought to confirm as a factual matter what the parties' original intent had been regarding dilution protection. She had not been employed by Valerus at the time the Original Warrant was executed, so she spoke to Valerus's Chief Financial Officer Ruben Kendrick, who had been involved in the 2006 transaction. Kendrick understood the Original Warrant language provided Guggenheim with an undilutable 3.5% equity interest in Valerus. The record reflects that Co-Chief Executive Officer Mike McGhan could neither recall nor was he ever aware of the specifics of the dilution protection afforded in the Original Warrant; he had left negotiating the specifics of the 2006 deal with Kendrick and Valerus's investment bankers. And Co-Chief Executive Officer Chet Erwin, although admittedly aware in 2006 of the nature of the financial transaction with GFC including the dilution protection provided in the Original Warrant, could not recall the specifics of the deal when asked about it by Cunningham in 2009.[5]

Cunningham asked her contact at Sanders Morris Harris about the 2006 Guggenheim transaction, but this individual was unaware who at Sanders Morris Harris had worked on the 2006 deal. Cunningham also reached out to Valerus's attorneys—Jim Stephenson or Julie Fournier at SS&F—who had been involved in the GFC transaction that resulted in the Original Warrant. But these attorneys could not shed light on the original intent regarding dilution protection; they told Cunningham if they could find any files regarding the transaction, they would

---

[5] Erwin testified in a deposition that, in 2006, it was "clear" to him what the "business guys had agreed to" in the Original Warrant—i.e., Guggenheim was entitled to 3.5% equity in Valerus at closing of the transaction, with dilution protection only for management compensation—but that "[a] lot happened between 2006 and 2009" and there was "no way" he could recollect "precisely" the deal that Valerus and Guggenheim negotiated in 2006.

forward them to her. Cunningham did not receive any files from outside counsel regarding the transaction. In Cunningham's view, the Original Warrant and Interim Warrants, which specified a number of shares, contained a "cushion" providing anti-dilution protection,[6] and additional anti-dilution provisions intended to keep Guggenheim at a fixed percent, were unnecessarily confusing and needlessly complicated. Kendrick suggested that Cunningham contact Jeff Nichols, who had been one of GFC's outside counsel during the 2006 negotiations, to confirm GFC's understanding of the original intent of the warrant's dilution clause and to discuss amending the warrant to clarify that intent. In February 2009, Cunningham contacted David Ronn, a former colleague of hers, at the law firm Greenburg Traurig.

Cunningham explained to Ronn that she was seeking to understand and clarify the warrants. She explained to Ronn that she had reached out to the lawyers who represented Valerus during the transaction and that they could not recall the specifics. She informed Ronn that Kendrick suggested that she speak with Jeffrey Nichols, a partner at Greenberg Traurig who had represented GFC in the original transaction, to clarify GFC's original intent regarding the dilution issue. Cunningham told Ronn that if Nichols agreed that the intent was what Kendrick remembered, she had an "easy drafting fix" for the warrants. Ronn confirmed that Cunningham should speak with Nichols.

*Valerus and Guggenheim Amend the Interim Warrants in an Attempt to Clearly Reflect the Intent of the Original Warrant*

Shortly after Cunningham's discussion with Ronn, on February 19, 2009, Nichols emailed her, informing her he understood that Cunningham was

---

[6] Nothing on the face of the warrant shows that there is any "cushion," as described by Cunningham.

"interested in revising the warrant to make it easier to keep [G]uggenheim at the right percentage without doing brain-damaging calculations" and that he "agree[d] 110%." Cunningham then spoke with Nichols by telephone and told him that there were questions about the warrants from Metalmark's attorneys. Cunningham informed Nichols that the warrants were confusing. Cunningham told Nichols that Kendrick thought the warrant was supposed to provide Guggenheim "3.5% for always"; she explained to Nichols that she did not want to change the substance of the warrants, but she wanted to clarify the language to clearly reflect the original intent.

Nichols emailed Cunningham after this conversation to follow-up on the call. In this February 20th email, Nichols explained that he had looked at the Original Warrant and "did not see any language regarding the cushion." Nichols stated that Jim Stephenson, Valerus's counsel at the time the Original Warrant was negotiated, "would have wanted something in the warrant if that was the intent." Nichols informed Cunningham that he would check to see if he had any notes from the original transaction, but that "a lot" of the work had been done at his former law firm. Nichols never provided Cunningham any further information regarding the original transaction. But later that same day, Nichols had an associate send Cunningham proposed warrants that provided that Guggenheim would be awarded a flat, undesignated percentage interest in Valerus on the exercise of the warrants and removing all the adjustment provisions contained in section 8. Cunningham believed this change fixed the "drafting problem" in the Original and Interim Warrants. In April 2009, after nine weeks of negotiating various terms of the proposed warrants unrelated to the "percentage at exercise" intent, Cunningham authorized the execution of new warrants with clear language providing for an

7

award of Valerus shares to Guggenheim equivalent to a 3.5% interest in Valerus's outstanding equity on the exercise of the warrants (the Amended Warrants).

*Valerus Discovers the Amended Warrants Do Not Reflect the Parties' Original Intent*

Metalmark never made the contemplated investment in Valerus. After negotiations with Metalmark reached an impasse, Valerus began negotiations with affiliates of TPG Capital, L.P. On December 23, 2009, TPG made a $242.5 million cash investment in Valerus in exchange for shares in Valerus; under the terms of the Amended Warrants, Guggenheim was entitled to additional shares based on this equity sale. TPG negotiated that Guggenheim's 3.5% would be taken entirely from Valerus's management's interest, rather than TPG's equity stake in the company. During the course of due diligence by TPG before closing on the transaction with Valerus, attorneys for TPG remarked that the Amended Warrants were "highly, highly, highly unusual." This comment caused Erwin to recall that the Original Warrant was supposed to have been "customary and standard." Valerus subsequently discovered that it had been mistaken about the dilution protection afforded in the Original Warrant. Valerus determined that, under the terms of the Original Warrant, Guggenheim was guaranteed a 3.5% interest in Valerus calculated "as of"—i.e., "on"—the closing of the original transaction. Valerus engaged in discussions with Guggenheim in an attempt to resolve the dispute about the number of shares to be issued on exercise of the Amended Warrants. Ultimately these discussions failed to resolve this dispute.

In June 2011, Valerus filed suit against Guggenheim, seeking rescission of the Amended Warrants, among other claims. Valerus amended its pleading to seek a temporary restraining order and temporary injunction to restrain Guggenheim from exercising the Amended Warrants; Valerus's request for a temporary

injunction was denied in August. Thereafter, Guggenheim requested that Valerus transfer all the Amended Warrants to Orpheus Holdings. Orpheus Holdings then exercised the Amended Warrants in exchange for a total of 5,862,351 Valerus shares, which represented a 3.5% interest in Valerus on that date, i.e., on the exercise date. Had Guggenheim instead exercised the Interim Warrants on that date, it would have been entitled to 1,071,746 shares in Valerus—a difference of 4,790,605 shares.

In December 2011, the trial court granted Guggenheim partial summary judgment, dismissing Valerus's claim that the Amended Warrants should be rescinded due to lack of consideration. In August 2012, the trial court granted summary judgment in favor of Valerus on Guggenheim's claim for attorney's fees. In April 2013, the trial court denied Guggenheim's second motion for summary judgment; the case proceeded to a bench trial that month. Prior to trial, the parties entered into a Rule 11 agreement, in which Valerus agreed that that it would not seek damages for the value of the extra 4,790,605 shares Orpheus Holdings received as a result of the Amended Warrants and that cancellation of those shares would be Valerus's remedy in the event it prevailed on any of its claims for relief.

In June 2013, the trial court signed a judgment in favor of Valerus on its mutual and unilateral mistake claims and denying Valerus's claims of fraud, conversion, and violation of the Texas Securities Act. The trial court's judgment orders the Amended Warrants rescinded and reinstates the Interim Warrants, entitling Valerus to cancel the extra 4,790,605 shares it had issued to Guggenheim. The trial court later signed findings of fact and conclusions of law. After Guggenheim's motion for new trial was denied by the trial court, this appeal followed.

## II.    AMBIGUITY OF THE PRE-AMENDMENT WARRANTS

Guggenheim's first two issues rest on a conclusion that the Original Warrant is not ambiguous.  Indeed, the parties agree that, if the pre-amendment warrants are not ambiguous, Valerus's mistake claims must fail.  Thus, we begin by determining whether the trial court properly concluded that these warrants "were ambiguous as to Guggenheim's dilution protection for issuances to equity investors."  And determining whether a contract is ambiguous is a question of law we review de novo. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008).

## A.    Summary of the Parties' Dispute Regarding the Pre-Amendment Warrants

The parties' dispute primarily concerns the following provisions of the pre-amendment warrants:

8.    Adjustments.  The number and kind of securities purchasable upon exercise of this Warrant and the Exercise Price shall be subject to adjustment from time to time as follows:

8.1    Subdivisions, Combinations and Other Issuances. If the Company [Valerus] shall at any time prior to the expiration of this Warrant subdivide the Shares, by split up or otherwise, or combine its Shares, or issue additional units of its Partnership Interests as a dividend or as compensation to, or part of an incentive program for, any current or former employees (*e.g.*, issuances of Class A Shares to employees or Class B Shares to employees of the Company in connection with the termination of employment of such employees), the number of Shares issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or Partnership Interests dividend or issuances to employees or terminated employees, or proportionately decreased in the case of a combination. Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of Shares purchasable under this Warrant (as adjusted) shall remain the same. Any adjustment under this Section 8.1 shall

become effective at the close of business on the date the subdivision or combination becomes effective, or as of the record date of such dividend or issuance, or in the event that no record date is fixed, upon the making of such dividend issuance.

\*\*\*

8.4    Other Dilutive Events. In case any event shall occur as to which the provisions of this Section 8 are not strictly applicable, but the failure to make any adjustment would not fairly protect the purchase rights presented by the Warrants in accordance with the essential intent and principles of this Section 8 (*i.e., to maintain the Holder's 3.5% interest in the Company or the Company's permitted successor or assigns as of August 10, 2006*), then, in each such case, the Company shall make a good faith adjustment to the Exercise Price and the number of Shares or Other Securities in accordance with the intent of this Section 8 and, upon the written request of the Holder, shall appoint an independent financial expert, which shall give their opinion upon the adjustment, if any, on a basis consistent with the essential intent and principles of this Section 8, *necessary to preserve, without dilution, the right of the Holder to acquire a total of 3.5% of the Partnership Interests of the Company or the Company's permitted successor or assigns as of August 10, 2006.*

(emphasis added).  Guggenheim asserts that section 8.4 clearly and unambiguously reflects the parties' intent that the Original Warrant provides Guggenheim with a 3.5% stake in Valerus based on Valerus's capital structure on August 10, 2006. Valerus, on the other hand, contends that this section, when read in concert with other provisions of the warrant, also can fairly be read to provide Guggenheim with a 3.5% stake in Valerus when Guggenheim exercises the options.

B.    **Governing Law**

In construing a contract, we must ascertain and give effect to the parties' intent as expressed in the contract.  *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).  In determining the parties' intent, we examine and consider the entire contract in an effort to harmonize and

give effect to all provisions of the contract so that no provisions are rendered meaningless. *Id.* A contract is not ambiguous "merely because the parties disagree on its meaning." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Likewise, lack of clarity or even inartful drafting will not alone render an agreement ambiguous. *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006). "Rather an ambiguity arises when an agreement is susceptible to more than one reasonable meaning after application of established rules of construction." *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746–47 (Tex. 2003). A contract may be patently ambiguous—i.e., the ambiguity is apparent on the face of the contract—or latently ambiguous, which means that the ambiguity only becomes apparent when a facially unambiguous contract is applied under particular circumstances. *DeClaris Assocs. v. McCoy Worplace Solutions, L.P.*, 331 S.W.3d 556, 562 (Tex. App.— Houston [14th Dist.] 2011, no pet.) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). Finally, in construing a contract in a business context, we bear in mind the particular business activity sought to be served and need not strain to apply construction rules to avoid ambiguity at all costs. *Id.*

## C. Application

The trial court concluded that section 8.4 was ambiguous. First, the trial court determined that this provision establishes the "essential intent and principles" for all of section 8. The trial court went on to reason that this "essential intent" to maintain Guggenheim's 3.5% interest in Valerus conflicts with section 8.1, which provides, in pertinent part, that Guggenheim would be entitled to additional shares in the event that Valerus issued shares as incentive compensation to its employees after August 2006.

The problem in reconciling these two provisions becomes apparent with the second iteration of the "essential intent and principles of this Section 8": to preserve, without dilution, the right of Guggenheim to acquire a total of 3.5% of the *shares* of Valerus as of August 10, 2006." If more shares were issued to employees after August 2006, and under the terms of section 8.1, more shares were also issued to Guggenheim, then Guggenheim would necessarily have the right to acquire more than a total of 3.5% of the shares of Valerus outstanding on August 10, 2006. This conflict occurs because the 3.5% of *shares* Guggenheim is entitled to receive "as of August 10, 2006" can be read to establish a number of shares set in stone *on* that particular date. The fact that the Original Warrant specifies a number of shares, rather than a percentage of equity, indicates that this reading of the provision could be the one the parties intended. If Guggenheim were to receive shares in excess of that specific number, then it would be by default receiving the right to acquire more than a total of 3.5% of the shares of Valerus calculated *on* August 10, 2006. We thus conclude that this interpretation of the Original Warrant is reasonable.

However, this conflict could be resolved if this provision is read to establish a starting date for the number of shares that Guggenheim is entitled to receive. Thus, if we read "as of" to mean "beginning on" August 10, 2006, then this conflict between these two provisions is resolved because the number of shares that Guggenheim is entitled to receive under section 8.4 can change over time, so long as Guggenheim's equity interest in Valerus remains at 3.5%. Although this reading of the contract does not necessarily align with the fact that the Original Warrant provides a specific number of shares to Guggenheim, the warrant clearly contemplates that additional shares will be awarded to Guggenheim in certain

13

circumstances. Thus, we conclude that this interpretation of the warrant is also reasonable.

Because these two interpretations are both reasonable, the trial court did not err in determining that the Original Warrant is ambiguous. *See Universal Health Servs., Inc.*, 121 S.W.3d at 746–47. We thus overrule Guggenheim's first two issues and turn to Guggenheim's challenges to Valerus's mistake claims.

## III. VALERUS'S MISTAKE CLAIMS

### A. Valerus Did Not Possess Documents Establishing the Meaning of Section 8.4

Guggenheim asserts in its third issue that, regardless of ambiguity, Valerus possessed information conclusively showing what section 8.4 meant and thus is precluded from relying on the mistake doctrine. In support of this issue, Guggenheim relies primarily on an email from Valerus's investment banker, SMH representative Gregg Mockenhaupt, sent to Guggenheim representatives during the negotiations of the Original Warrant. This email was copied to Valerus's Kendrick, who then forwarded the email to co-CEO's Erwin and McGhan.

In this August 9, 2006, email, Mockenhaupt stated that he had "conferred with the company with respect to the warrant language" and was "hopeful that this is just a matter of aligning expectations." Mockenhaupt stated that, during the previous negotiations, none of the parties was "of the impression" that Valerus was agreeing to "a completely non-dilutable 3.5% equity interest." Mockenhaupt acknowledged that dilution protection in the event of a reorganization or stock split was "standard for a warrant agreement" and that there "may even be some middle ground with respect to an anti-dilution adjustment if the company establishes or increases any management incentive stock option plans." However, Mockenhaupt emphasized that "[t]he real issue from the company's perspective has to do with

14

their ability to use their equity as a financing tool or as acquisition consideration." He noted that, in SMH's experience, "it is highly unusual to see a lender get a non-dilutable interest" in that instance and that "it's not something [Valerus] can accept." Mockenhaupt closed the email as follows:

> We could talk about some sort of pre-emptive right that will allow the warrant holder to participate in future financings at such a level to keep their pro forma ownership interest at their pro rata share of 3.5%, and establish some similar provision in the event of an acquisition using the company's equity securities.

> We're obviously close to completion of this financing and [Valerus] is most eager to get the Guggenheim relationship underway. Let's discuss a resolution tomorrow at your convenience.

This email establishes that Valerus was *negotiating* with Guggenheim regarding dilution protection and that Valerus was not amenable to "completely non-dilutable" equity protection, It does not detail the conclusion of such negotiations; taken alone, it does not establish the meaning of section 8.4. And as discussed above, this provision was open to interpretation.

Importantly, we defer to unchallenged findings of fact that are supported by the record. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). Here, Guggenheim has not challenged the following findings made by the trial court:

> The dispute [regarding dilution] was resolved . . . in a conversation between Mr. Mockenhaupt [of Sanders, Morris, Harris] and a Guggenheim representative, Andrew Kenney. In that conversation, Mr. Mockenhaupt and Mr. Kenney orally agreed that the warrants would (i) grant a specific number of shares that represented 3.5% of Valerus on the date the warrants were issued and (ii) include adjustment provisions that protected Guggenheim from dilution in the event Valerus entered certain non-cash transactions (such as grants of shares to Valerus employees as incentive compensation) that would otherwise dilute the economic value of the original grant of shares.

***

15

Contemporaneous internal Guggenheim e-mails describe the oral compromise and acknowledge the understanding that Guggenheim would have no dilution protection for share issuances to equity investors. In an August 10 e-mail exchange between Mr. Kenney and his boss, Tim Murray, Mr. Murray first wrote, "I thought we were going to allow for some dilution for employee [incentive compensation programs]. Looks like we didn't, which is better for us." Mr. Kenney replied:

> *[N]o that was part of the compromise, we[']re not diluted unless they go out and raise cash equity.* [E]mployee comp[ensation], reorg[anizations] and [stock] splits were protected.

This is the only contemporaneous document that clearly stated the parties' understanding that Guggenheim would not have dilution protection in connection with the issuance of shares to an equity investor. . . .

Unlike Guggenheim, Valerus had no contemporaneous documents in its files that clearly confirmed the oral compromise the parties had reached.

***

There is no evidence that anyone with SMH had knowledge of the 2006 intent in early 2009. There is no evidence that Mr. Mockenhaupt, the Valerus representative who negotiated the compromise, was even with the SMH firm at that time. There is no evidence that the scope of SMH's agency in connection with the Credit Agreement and the Original Warrant extended beyond when those transactions were consummated in 2006. Upon the closing of the 2006 transaction, SMH had no duty to ascertain or transmit any further information to Valerus with respect to the warrant or the Credit Agreement. Furthermore, there is no evidence SMH was engaged to represent Valerus in 2009 in connection with the warrant amendments. Ms. Cunningham testified that Goldman Sachs was Valerus's banker in 2009, and that Barclay's was involved as well. SMH was providing only a fairness opinion in connection with Metalmark. There is no evidence showing the subject matter of the opinion, the terms of any engagement of SMH, or any other information relating to the scope of that project. . . . SMH was not

included on a single communication involving the warrant amendments or the warrants.

***

Similarly, there is no evidence that by 2009, SS[&]F represented Valerus at all. SS[&]F had no duty to transmit any information to Valerus. . . Ms. Cunningham's call to the firm demonstrates it had no recollection of any knowledge to transmit to her, nor any documents that would confirm the original intent.

These findings are supported by the record. *See id.*; *see also Reich & Binstock, LLP v. Scates*, —S.W.3d—, No. 14-13-00906-CV, 2014 WL 6851606, at *3 (Tex. App.—Houston [14th Dist.] Dec. 4, 2014, no pet. h.) ("Because R&B has not specifically challenged any of the trial court's factual findings, they are binding on this court unless the contrary is established as a matter of law or if there is no evidence to support the findings."). And, as noted above, the email upon which Guggenheim relies, which admittedly was in Valerus's possession, indicates that Valerus and Guggenheim were in negotiations concerning dilution protection. This email does not establish as a matter of law the meaning of section 8.4. Thus, these findings are binding on this court, and we overrule Guggenheim's third issue.

## B.     Sufficient Evidence Supports Valerus's Unilateral Mistake Claim

Guggenheim asserts in its fourth issue that Valerus failed to provide legally or factually sufficient evidence to support its mistake claims. We begin with the standard of review and governing law regarding mistake claims, then apply the law to the evidence in this case.

### 1.     *Standard of Review*

We review a trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards that we apply in reviewing jury verdicts. *Hightower, Russo & Capellan v. Ireson, Weizel & Hightower, P.C.*, 420 S.W.3d

17

315, 321 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). When the appellant attacks the legal sufficiency of a finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the finding. *Id.* at 810. We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates that: (1) there is a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.*

To evaluate the factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Finally and importantly, as discussed above, unchallenged findings of fact are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard*, 722 S.W.2d at 696; *Reich & Binstock*, 2014 WL 6851606, at *3.

## 2.    *Governing Law*

Valerus sought rescission of the warrants under theories of both mutual and unilateral mistake. Because the doctrine of unilateral mistake supports the trial court's judgment,[7] we turn first to the elements of this defense. A unilateral mistake will support equitable relief when a plaintiff shows: (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense; i.e., rescission must not result in prejudice to the other party except for the loss of his bargain. *James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist.*, 160 Tex. 617, 335 S.W.2d 371, 373 (1960); *Ross v. Union Carbide Corp.*, 296 S.W.3d 206, 219–20 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (en banc). Each of these elements is a fact issue. *James T. Taylor & Son, Inc.*, 335 S.W.2d at 376. Further, other circumstances, "such as the acts and extent of knowledge of the parties" are also relevant. *Id.* at 373.[8]

---

[7] *See Matter of Marriage of Merrikh*, No. 14-14-00024-CV, 2015 WL 1247064, at *5 (Tex. App.—Houston [14th Dist.] Mar. 17, 2014, no pet. h.) (mem. op.) (explaining that we must affirm the judgment if it can be upheld on any legal theory supported by the evidence).

[8] Unilateral mistake is a doctrine that is similar but legally distinct from a "mistake-plus-knowledge" claim. Mistake-plus-knowledge is a subset of the mutual mistake doctrine. *See, e.g., Davis v. Grammar*, 750 S.W.2d 766, 768 (Tex. 1988) ("Unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake."). However, the trial court made several challenged findings that support Valerus's mistake-plus-knowledge claim: (1) Valerus told Guggenheim that it wanted to amend the warrants because Guggenheim's interests were implicated in the Metalmark transaction, and Guggenheim's interests in this equity sale transaction would only be implicated if Guggenheim had dilution protection in this situation; (2) Valerus sent Guggenheim its financial statements that clearly set forth Valerus's mistaken view on Guggenheim's dilution protection; (3) Valerus's Kendrick and Guggneheim's Kenney spoke regularly about the Metalmark transaction, and Kendrick was mistaken about the dilution protection afforded by the warrants; and (4) when Cunningham suggested that the warrants be amended to more clearly reflect the parties' original intent,

## 3. *Application*

The mistake found by the trial court is that the parties intended that the Original Warrant give Guggenheim a 3.5% interest in Valerus *upon the exercise of the warrants*. In fact, it is now undisputed that at the time the parties entered into the Original Warrant, it was their intent to give Guggenheim a 3.5% interest in Valerus *calculated on August 10, 2006*. The trial court made numerous findings relevant to the unilateral mistake doctrine, many of them unchallenged. We next place these findings in context with the elements of unilateral mistake.[9]

- *The mistake is of so great a consequence that to enforce the contract as made would be unconscionable.*

The parties agree that, under the intended terms of the Original Warrant, Guggenheim would have been entitled to 3.5% of Valerus's equity calculated on August 10, 2006. Under the terms of the Amended Warrants, however, Guggenheim was entitled to 3.5% of Valerus's equity on the date that it exercised the warrants. Further, the trial court made the following findings relative to this element:

> Valerus did not need to amend the warrants to facilitate the Metalmark transaction. It received nothing of value in exchange for promising to issue Guggenheim, as it happened, millions of dollars' worth of additional shares that would dilute the holdings of innocent

Nichols agreed "110%" and quickly had draft warrants affording full dilution protection prepared and sent to Cunningham. These findings, although contested, are supported by the record; thus, they are binding on this court. *See McGalliard*, 722 S.W.2d at 696. Indeed, many of these findings are based on the trial court's determination about the credibility and the weight to be given the testimony of various witnesses. And these findings lie solely within the purview of the trial court as the finder of fact. *See Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

[9] Guggenheim relies heavily on *Fina Supply, Inc. v. Abilene National Bank*, 726 S.W.2d 537 (Tex. 1987). But *Fina Supply* involved *unambiguous* contract extensions, not an ambiguous contract that was amended in an effort to reflect the parties' original intent. *See id.* at 539–40. The holding in *Fina Supply* thus has no bearing on the unique facts of this case.

20

shareholders. There is no commercial reason to justify this result; it simply resulted from Valerus's reasonable mistake. There is a gross disparity in values exchanged. The contract is oppressive and unreasonable. Moreover, the economic cost of this windfall is born entirely by the legacy shareholders of Valerus, principally founders and employees. Additionally, and as an independent basis for finding unconscionability, the circumstances surrounding the negotiation of the Amended Warrants render enforcement unconscionable. The Valerus agents involved in the original negotiations who were still Valerus agents at the time of the amendments in 2009 (including Mr. Kendrick), were unsophisticated with respect to warrants and were mistaken about the scope of Guggenheim's dilution protection. Guggenheim was very sophisticated with respect to warrants and was fully aware of the Valerus agents' unsophistication and mistaken understanding. Valerus's representatives in the amendment negotiations . . . were not present for the drafting of the Original Warrants while Guggenheim's representatives . . . were. Ms. Cunningham was in and out of the office dealing with recovering from major surgery and tests relating [to] the recurrence of her cancer. Guggenheim was aware of Ms. Cunningham's health issues during the negotiation of the amendments. Guggenheim was also aware that Valerus was in the midst of a liquidity crisis and was under tremendous pressure to complete the transaction with Metalmark.

Guggenheim has challenged these findings, but numerous other unchallenged fact findings underlie these particular findings. For example, Guggenheim has not challenged the trial court's earlier finding that "[i]n negotiating with Guggenheim in 2006, Mr. Erwin, Mr. McGhan, and Mr. Kendrick relied extensively on Valerus's legal and financial advisers" and were not "sophisticated" regarding warrant transactions. Similarly, Guggenheim has not challenged the trial court's finding that Valerus's existing limited partners went from 100% ownership to less than 20% ownership as a result of the TPG transaction. Guggenheim likewise has not challenged the trial court's finding that Valerus did not receive any financial compensation from Guggenheim in exchange for amending the warrants, nor has it challenged the finding that "none of the changes had any value to Valerus and the

21

change in the method of calculating shares issuable under the warrants was of significant detriment to Valerus." Further, it is undisputed that Valerus's representatives during the negotiation of the Amended Warrants were not involved in the drafting of the Original Warrant and that Nichols, Guggenheim's representative, was. Finally, it is undisputed that Cunningham was having serious health issues during the negotiation of the Amended Warrants. Several findings, supported by the record, establish these facts; thus, they are binding on this court. *See McGalliard*, 722 S.W.2d at 696. All of these factors support the trial court's finding of unconscionability.

Guggenheim, however, asserts that Valerus failed to show that enforcing the contract as made would be unconscionable because: (1) both sides made concession in negotiating the Amended Warrants; (2) the value of any additional units Guggenheim obtained could have been zero if Valerus went bankrupt, which was a real possibility at the time; and (3) the deal turned out worse for Valerus because of the onerous TPG transaction that occurred six months' after the Amended Warrants were executed. We address each of these assertions in turn.

First, both sides did make concessions in negotiating the Amended Warrants. But all of these concessions occurred *after* the parties agreed that the 3.5% equity stake in Valerus would be calculated at exercise, rather than at the August 10, 2006 execution. None of these "concessions" would have been necessary had Valerus not mistakenly believed that Guggenheim was entitled to a 3.5% equity stake at exercise. The trial court made findings to this effect, which are unchallenged on appeal, supported by the record, and thus binding on this court. *See id*. Further, that Valerus was contemplating bankruptcy at the time it executed the Amended Warrants has no bearing on whether enforcing the Amended Warrants would be unconscionable. In fact, this factor is more

22

appropriately considered when analyzing whether Valerus exercised ordinary care in executing the Amended Warrants. *Cf. James T. Taylor & Son*, 335 S.W.2d at 374–76 (noting that external pressures bear on whether party exercised ordinary care).

Second, Guggenheim's allegation that the Amended Warrants only became a bad deal for Valerus because of the TPG transaction that occurred six months' after they were executed is not availing. The trial court made the following unchallenged finding:

> Valerus calculated in connection with the Metalmark transaction that Guggenheim's dilution protection would result in Guggenheim receiving "989,853 Class B Units pre-transaction, and 2,059,089 Class B units post-transaction." Thus, instead of being diluted to approximately 1.68% of the company upon issuance of shares to Metalmark, as it would have been under the Pre-Amendment Warrant, Guggenheim would have maintained 3.5% of the company. This would have been a material shift in wealth to Guggenheim even before TPG came into the picture. Anti-dilution protection for equity investors was a very significant, material right that Valerus mistakenly provided to Guggenheim in exchange for nothing of value.

This unchallenged finding is supported by the record, and thus, is binding on this court. *See McGalliard*, 722 S.W.2d at 696. In short, Guggenheim's assertion that it was the TPG transaction that occurred after the Amended Warrants were executed that made these warrants unconscionable is unavailing.

In sum, we conclude that the trial court's unchallenged findings of fact support a conclusion that the mistake at issue here is of so great a consequence that to enforce the Amended Warrants would be unconscionable. *Cf. Int'l Ins. Co. v. Jataine*, 495 S.W.2d 309, 321–23 (Tex. Civ. App.—Corpus Christi 1973, writ ref'd n.r.e.) (holding that appellant was entitled to return of funds under a theory of

unilateral mistake because if the funds were not returned, appellees would acquire a windfall and be unjustly enriched).

- *The mistake relates to a material feature of the contract.*

In this case, the mistake at issue relates to the intent of the parties relative to the dilution protection provided in the Original Warrant. As noted above, warrants are often added as a "sweetener" to entice investors. The Original Warrant was negotiated as part of a large credit agreement between Valerus and GFC, but the value of the warrant was the primary concern of the parties during their warrant negotiations. Thus, the dilution protection afforded GFC was a factor that both parties discussed and negotiated in multiple conversations and communications, albeit in a very short amount of time. In unchallenged findings supported by the record, the trial court found that GFC initially drafted a warrant containing full dilution protection by entitling GFC to additional shares in the event Valerus issued shares to equity investors. The trial court further found as follows regarding the dilution issue:

> Throughout the next day, August 9, the parties exchange[d] e-mails debating whether the warrant should be 3.5% of Valerus at exercise or 3.5% at issuance of the warrant. There was no resolution by the end of the business day. In an e-mail at 5:04 p.m., Mr. Nichols [representing GFC] maintained that the 3.5% was to be calculated "at the time of exercise, not now. We discussed this with [Guggenheim] and they felt that this was the deal." At 6:12 p.m., in responding to a Valerus e-mail arguing that the term sheet contemplated 3.5% at issuance, Mr. Nichols argued, "[Guggenheim] gets warrants at closing, not 3.5% equity (which is given at exercise). The difference is whether 'at time of closing' refers to 'warrants' or '3.5%'" The day ended with a final note from Valerus's financial advisor, Gregg Mockenhaupt of Sanders Morris Harris ("SMH"), who told Guggenheim that Valerus did not wish to accept such an obligation, because it would penalize existing owners if Valerus sold new equity to raise capital from third parties. IF Valerus sold new equity after the

24

issuance of the warrant to Guggenheim, Guggenheim's 3.5% would result in Guggenheim receiving more shares of Valerus to make up a 3.5% stake and the existing owners' percentage stake would be decreased.

As discussed above, the trial court further found that the dispute was resolved the next day through a conversation between Mockenhaupt and Guggenheim representative, Andrew Kenney. The nature and content of the parties' negotiations regarding the warrant clearly indicate that the dilution protection afforded in the Original Warrant was the major factor of concern.

Accordingly, there can be little doubt that the parties' intent regarding the dilution protection contained in the Original Warrant was a material feature of the contracts. This factor thus militates in favor of Valerus's unilateral mistake claim.

- *The mistake was made despite Valerus's exercise of ordinary care.*

"[T]he very word 'mistake' itself may connote some degree of negligence," and "ordinary negligence . . . will not necessarily bar the granting of equitable relief." *James T. Taylor & Son*, 335 S.W.2d at 374 (quotation omitted). Each allegation of "negligence must depend to a great extent upon its own circumstances," such as "ill health," time constraints, and other external pressures. *Id.* at 374–76 (summarizing cases). The trial court made several unchallenged findings that support a conclusion that Valerus exercised ordinary care in its efforts to determine the intent of the Original Warrant: (a) the existence of external pressures, including the 2008-2009 credit crisis; (b) time constraints, including Valerus's liquidity crisis and the fact that Valerus's personnel and attorneys were occupied by a number of extra tasks associated with the proposed Metalmark transaction; and (c) Cunningham's ill health, i.e., her recent cancer surgery and ongoing testing and treatment at the time.

The trial court further found that Cunningham "used her best efforts to ascertain the original intent in light of the circumstances existing at the time," including consulting with Kendrick, Erwin, and McGhan; consulting with SMH and SS&F; and closely analyzing the plain language of the Original Warrant. The trial court found that "after reaching out to the Valerus side of the 2006 negotiations, Ms. Cunningham had the mistaken understanding that the original intent was that Guggenheim was to receive 3.5% always, which entitled Guggenheim to additional shares if Valerus issued Shares to Metalmark in connection with a Metalmark equity investment in Valerus."

The trial court flatly rejected Guggenheim's suggestions that Cunningham "should have conducted a forensic examination of the company's email servers and turned over the company file room in search of documents that no one knew existed in 2009" as "unrealistic" and imposing "a standard of care on Valerus far exceeding that of ordinary care." And, as discussed above, even if Cunningham had "turned over the company file room," Valerus had no document setting out the terms of the 2006 oral compromise.

These unchallenged findings of fact, supported by the record and binding on this court,[10] establish that Valerus exercised ordinary care in attempting to discern the intent of the ambiguous dilution protection afforded in the Original Warrant. Guggenheim has not directed us to any evidence on the part of Valerus or its agents that would preclude Valerus's recovery under the theory of unilateral mistake.[11] *See James T. Taylor & Son*, 335 S.W.2d at 374–76; *cf. Florsheim Co. v. Miller*, 575 F. Supp. 84, 85–87 (E.D. Tex. 1983) (discussing four-part *James T.*

---

[10] *See McGalliard*, 722 S.W.2d at 696.

[11] The trial court further rejected the notion that Erwin and McGhan were negligent because they forgot the details of the 2006 warrant transaction, pointing out that both Guggenheim's Boehly and Murray admitted that they could not recall the details.

*Taylor* test and focusing particularly on ordinary care element). Thus, we conclude that this factor supports Valerus's unilateral mistake claim.

- *Rescission does not result in prejudice to Guggenheim except for the loss of its bargain.*

Rescission of the Amended Warrants would place Guggenheim in the position it would have been in had these warrants not been executed. In other words, the only loss to Guggenheim is the loss of its bargain based on the mistake of Valerus. Guggenheim would be placed in the position it was before the Amended Warrants were issued and would be entitled to the benefits under the Original Warrant. In short, after examining the trial court's findings relative to the *James T. Taylor* factors described above, we conclude that legally and factually sufficient evidence supports rescission of the Amended Warrants based on Valerus's unilateral mistake claim. *See James T. Taylor & Son*, 335 S.W.2d at 372–73. We thus overrule Guggenheim's fourth issue.

## IV. VALERUS DID NOT BEAR THE RISK OF MISTAKE

In Guggenheim's fifth issue, it urges that the trial court erred in finding for Valerus on Valerus's mistake claim because the record conclusively established that Valerus bore the risk of mistake and insufficient evidence supports the trial court's findings and conclusions on this issue. Guggenheim first asserts that because Valerus was subject to the "conscious ignorance" doctrine, it cannot rely on the doctrine of mistake. Guggenheim then contends that Valerus assumed the risk of mistake by contract. Finally, Guggenheim argues that it was not unreasonable to allocate the risk of mistake to Valerus. We address each of these arguments in turn.

## A. Under the Facts of This Case, Valerus Is Not Subject to the "Conscious Ignorance" Doctrine

Under the "conscious ignorance" doctrine, "a party bears the risk of mistake when . . . he knowingly treats his limited knowledge of the facts surrounding the mistake as sufficient." *Cherry v. McCally*, 138 S.W.3d 35, 40 (Tex. App.—San Antonio 2004, pet. denied). In other words, one "who intentionally assumes the risk of unknown facts cannot escape a bargain by alleging mistake or misunderstanding." *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 491 (Tex. 2005); *see also* Restatement (Second) of Contracts § 154 (1981) ("A party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient.").

Here, however, as detailed above, the trial court found that Valerus, through Cunningham's efforts, exercised ordinary care in investigating the intent behind the dilution protection provided in the Original Warrant. Valerus was not "consciously indifferent" to the facts surrounding this mistake. Instead, the court found that Cunningham carefully read the Original Warrant, discussed the intent of the warrants with Valerus personnel, and when she was unable to ascertain the intent behind the ambiguous dilution provisions, she sought out information from the executives at Valerus, the investment banking firm assisting with the original transaction, and the law firm that had been involved in negotiating the Original Warrant. She even contacted the law firm that had represented Guggenheim during the negotiation of the original transaction. Her investigation led her to erroneously conclude that Guggenheim was entitled to a 3.5% equity stake in Valerus when the warrants were exercised.

In sum, Valerus did not "intentionally assume[] the risk of unknown facts." *Geodyne Energy Income Prod. P'ship I-E*, 161 S.W.3d at 491. Cunningham was not consciously indifferent to the facts surrounding the mistake; rather she made a mistake after, as the trial court found, she "used her best efforts to ascertain the original intent in light of the circumstances existing at the time." Thus, Valerus is not subject to the "conscious indifference" doctrine.

## B. Valerus Did Not Assume the Risk of Mistake by Contract

Guggenheim points to the following provision of the Amended Warrants as establishing that the mistake of risk was allocated to Valerus by contract:

> No impairment. [Valerus] will not, by any voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by [Valerus], but will at all times in good faith assist in the carrying out of all of the provisions of this Section 8 and in the taking of all such action as may be necessary or appropriate to protect the rights of [Guggenheim] against impairment.

This provision, by its plain language, requires Valerus to protect Guggenheim against impairment; it does not allocate the risk of mistake to Valerus. The trial court concluded, and we agree, that the word "impairment" used in section 8.4 is a "technical business term used 'in reference to *diminishing the value of a contractual* obligation to the point that the contract becomes invalid or a party loses the benefit of the contract." (quoting Black's Law Dictionary 331–32 (2d pocket ed. 2001)). It is not comparable to allocation-of-the-risk provisions, such as "as is" sales or quitclaim deeds. *Cf.* Restatement (Second) of Contracts § 154(a) & cmt. b ("Just as a party may agree to perform in spite of impracticability or frustration that would otherwise justify his non-performance, he

29

may also agree, by appropriate language or other manifestation, to perform in spite of mistake that would otherwise justify his avoidance.").[12]

Further, the language of this provision indicates that it applies to adjustments made pursuant to section 8. And section 8 of the Amended Warrants deals only with adjustments due to reorganization, reclassification, consolidation, or merger. Nothing in section 8 of the Amended Warrants indicates that any adjustments should be made in connection with an equity sale; this change is reflected in the opening paragraphs of the Amended Warrants, which provide that Guggenheim will be entitled to 3.5% of the outstanding shares of Valerus on exercise of the warrants. We conclude that this provision does not allocate the risk of mistake to Valerus.

## C. Allocating the Risk to Valerus Is Not Reasonable

The trial court stated in its findings and conclusions that "it is not reasonable under the circumstances to allocate the risk of mistake to Valerus." In so concluding, the trial court relied on section 157 of the Restatement (Second) of Contracts. This section provides: "A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance . . . unless his fault amounts to a failure to act in good faith and in accordance with standards of fair dealing." Restatement (Second) of Contracts § 157. As described above, the trial court made several unchallenged findings that Valerus acted with

---

[12] The illustration to comment b illuminates the type of language that would allocate the risk to a particular party:

> A contracts to sell and B to buy a tract of land. A and B both believe that A has good title, but neither has made a title search. *The contract provides that A will convey only such title as he has, and A makes no representation with respect to title.* In fact, A's title is defective. The contract is not voidable by B, because the risk of the mistake is allocated to B by agreement of the parties.

Restatement (Second) of Contracts § 154 cmt. b (emphasis added). This sort of allocation-of-risk language is completely absent from the provision at issue in this case.

ordinary care in investigating the mistake at issue. Guggenheim has made no assertion that Valerus failed to act in good faith or in accordance with standards of fair dealing in negotiating the Amended Warrants. And there are certainly no findings by the trial court to this effect. Thus, we agree with the trial court that it is not reasonable under the circumstances to allocate the risk of mistake to Valerus.

For the foregoing reasons, we overrule Guggenheim's fifth issue.

## V. SUMMARY JUDGMENT ON GUGGENHEIM'S COUNTERCLAIMS

In Guggenheim's sixth and final issue, it asserts that the trial court erred by granting summary judgment for Valerus on Guggenheim's counterclaims for specific performance of section 8.4 of the Amended Warrants and for attorney's fees. Guggenheim asserts that section 8.4 of the Amended Warrants is a "covenant not to sue." We disagree.

Section 8.4's anti-impairment provision contains a promise of good faith performance. Nothing in this provision represents a covenant that Valerus would not sue to rescind the contract for an alleged mistake. This provision does not approach language in a covenant-not-to-sue provision: the plain language of this provision does not purport to prevent Valerus from filing suit. *See, e.g.*, *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 428–29 (Tex. 2015) (per curiam) ("Although the release provides an affirmative defense to future suits, we cannot construe it as including a covenant not to sue where, in fact, *the plain language does not bar future suits*." (emphasis added)).

Moreover, it has long been the rule in Texas that attorney's fees are only recoverable as allowed by contract or statute. *See, e.g.*, *Akin Gump v. Nat'l Dev. & Research*, 299 S.W.3d 106, 120 (Tex. 2009). Nothing in the Amended Warrants provides a right to attorney's fees. And under Texas Civil Practice & Remedies

31

Code § 38.001, Guggenheim could recover attorney's fees only if it prevailed; i.e., only if it recovered damages. *See, e.g.*, *MBM Fin'l Corp. v. Woodlands Oper. Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009) ("To recover fees under this statute, a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages."). Here, Guggenheim has not recovered any damages on any breach of contract claim.

In short, we agree with the trial court that Valerus did not breach section 8.4's anti-impairment provision by suing to rescind the Amended Warrants for alleged mistake. Moreover, Guggenheim did not prevail on any breach of contract claim. Thus, the trial court did not err by granting summary judgment to Valerus on this issue. We overrule Guggenheim's sixth and final issue.

## VI. CONCLUSION

First, we have determined that the Original Warrant was ambiguous, which requires us to overrule Guggenheim's first two issues. Based on the voluminous unchallenged findings of fact made by the trial court that are supported by the record, we have further concluded that (1) Valerus did not have possession of documents resolving this ambiguity and (2) Valerus's unilateral mistake claim is supported by sufficient evidence. We further agree with the trial court's conclusions that the risk of mistake was not allocated to Valerus under the circumstances presented in this case. Finally, we have overruled Guggenheim's challenge to the trial court's summary judgment in favor of Valerus on Guggenheim's breach of contract claims.

Accordingly, for the reasons expressed above, we affirm the trial court's judgment.


/s/  Sharon McCally
    Justice


Panel consists of Justices McCally, Brown, and Wise.